**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:  JOHN KEITH BAGOT and
      VIRGINIA MAY BAGOT,

                                     Chapter
                                     Case No. 09-33671 (MS)

        Plaintiffs.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

JOHN KEITH BAGOT and
VIRGINIA MAY BAGOT,

                                     Adversary Proceeding
        Plaintiffs,         Case No. 09-02912 (RTL)
   v.

GMAC MORTGAGE, LLC,
BANK UNITED, FSB,
WELLS FARGO BANK, N.A,
HOWARD OLMSTEAD, and
JOSHUA SATKIN,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

**OPINION**

**APPEARANCES:**

Leressa Crockett, Esq.
Attorney for Plaintiff

Leonard S. de Palma, Esq.
Attorney for Defendant Joshua Satkin

**RAYMOND T. LYONS, U.S.B.J.**

**INTRODUCTION**

Defendant, Joshua Satkin, moves for summary judgment against the Plaintiffs who have sued him for violations of the New Jersey Consumer Fraud Act (CFA) and common law fraud. Satkin was employed as a mortgage solicitor for a mortgage broker. Plaintiffs allege that Satkin: (1) improperly advised them to refinance both mortgages on their home resulting in a larger brokerage fee; (2) engaged in predatory lending by arranging a loan they clearly could not afford since the monthly payments exceeded their gross income; and (3) failed to disclose that they could have qualified for a reverse mortgage. Satkin counters that a third party lender made all of the disclosures regarding the loan terms and that he breached no duty to the Plaintiffs. Also he asserts that Plaintiffs were not qualified for a reverse mortgage.

The court finds that there are genuine issues as to material facts. Advising borrowers to apply for a mortgage that was inappropriate because they clearly could not afford the payments or refinancing the first mortgage when that was not necessary just to charge a larger brokerage fee could constitute an unconscionable commercial practice under the CFA. Failure to disclose that Plaintiffs could have accomplished their goals with a larger line of credit or a reverse mortgage, likewise, could support a finding of common law fraud. Plaintiffs are entitled to have these factual issues determined at trial. Satkin's motion for summary judgment is denied.

**JURISDICTION**

This court has jurisdiction of this proceeding under 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a) and the Standing Order of Reference by the United States District Court for the District of New Jersey dated July 23, 1984, referring all cases and proceedings arising under Title 11 of the

2

United States Code or arising in or related to a case under Title 11 of the Bankruptcy Code to the bankruptcy court.

## FINDINGS OF FACT AND PROCEDURAL HISTORY

The Plaintiffs, Mr. and Ms. Bagot, are both over 80 years old. They have lived in their home for approximately 42 years and have refinanced their home multiple times. Their primary source of income is Social Security. At the relevant time Mr. Bagot supplemented his income as a part time limousine driver and Ms. Bagot sold some crafts that she made at home. Less than a year prior to the events in question, the Bagots had obtained a thirty-year first mortgage for $275,000 and a home equity line of credit for $75,000. At that time their home was worth substantially more than the amount due on both mortgages. In 2006, the Plaintiffs had approximately $37,000 outstanding in credit card debt. Mr. Bagot responded to a radio advertisement for financial assistance and spoke with the Defendant, Joshua Satkin, a licensed mortgage solicitor. Satkin subsequently came to the Plaintiffs' home and discussed their financial situation. He helped them complete an application to refinance both the first mortgage and home equity line of credit plus an additional amount to pay off their credit card balances. The new loan was for $420,000 with an adjustable rate of interest. However, the new loan had a "teaser" rate of 1.7% per annum and monthly payments of $1,490.15 for the first year. In October 2007, the payment adjusted to $2,687.73 including taxes, and in October 2008 to $2,807.87 including taxes. These monthly payments exceeded the Bagots' gross income. Satkin's employer was paid a mortgage broker fee of $8,400 and a yield spread premium of $8,925 for a total of $17,325 at the closing.

The Bagots defaulted on their mortgage and the lender began foreclosure proceedings in state court. The Bagots filed bankruptcy and initiated this adversary proceeding in this court.

## DISCUSSION

*Summary Judgment Standard*

Summary judgment is appropriate where "the pleadings, the discovery, and disclosure materials on file, and any affidavits show there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has indicated, "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather an integral part of the Federal Rules as a whole which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). "In deciding a motion for summary judgment, the judge's function is to determine if there is a genuine issue for trial." *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 637 (3d Cir.1993).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Huang v. BP Amoco Corp.*, 271 F.3d 560, 564 (3d Cir.2001) (citing *Celotex Corp.*, 477 U.S. at 323. In determining whether a factual dispute warranting trial exists, the court must view the record evidence and the summary judgment submissions in the light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Issues of material fact are those "that might affect the outcome of the suit under the governing law." *Id.* at 248. An issue is genuine when it is "triable," that is, when reasonable minds could disagree on the result. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations

4

omitted).

Once the moving party establishes the absence of a genuine issue of material fact however, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. A party may not defeat a motion for summary judgment unless it sets forth specific facts, in a form that "would be admissible in evidence," establishing the existence of a genuine issue of material fact for trial. Fed.R.Civ.P. 56(e) (providing that in response to a summary judgment motion the "opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial"). *See also Fireman's Ins. Co. of Newark, N.J. v. DuFresne*, 676 F.2d 965, 969 (3d Cir.1982); *Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir.1972). If the non-moving party's evidence is a mere scintilla or is not "significantly probative," the court may grant summary judgment. *Liberty Lobby, Inc.*, 477 U.S. at 249–50. The non-movant will prevail only if the evidence produced is of "sufficient quantum and quality" to allow a rational and fair-minded fact finder to return a verdict in his favor, bearing in mind the applicable standard of proof that would apply at trial on the merits. *Id.* at 249.

*Consumer Fraud Act*

To state a case under the CFA, a plaintiff must demonstrate three elements: (1) an unlawful practice by the defendant; (2) an ascertainable loss by the plaintiff; and (3) a causal connection between the defendant's unlawful conduct and the plaintiff's ascertainable loss. *Prof'l Cleaning & Innovative Bldg. Servs. v. Kennedy Funding, Inc.*, 245 Fed. Appx. 161, 165 (3d Cir. 2007);

5

*Dabush v. Mercedes-Benz USA, LLC*, 874 A.2d 1110, 1115 (N.J. Super. Ct. App. Div. 2005).

The CFA defines "unlawful practice" as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . . .

N.J. STAT. ANN. § 56:8-2 (West 2012). Under the CFA, an "unlawful practice" may arise from: (1) an affirmative act; (2) a knowing omission; or (3) a violation of an administrative regulation. *Stoecker v. Echevarria*, 975 A.2d 975, 990 (N.J. Super. App. Div. 2009); *Gupta v. Asha Enterprises, L.L.C., Prod. Liab. Rep.*, 27 A.3d 953, 959 (N.J. Super. App. Div. 2011). The affirmative acts do not require proof of intent. *Bonnieview Homeowners Ass'n v. Woodmont Builders, L.L.C.*, 655 F.Supp.2d 473, 505 (D.N.J. 2009).

The "affirmative act" and "knowing omission" phrases are judicial constructs designed to aid in understanding and derive from the language of section 56:8-2 of the New Jersey statutes. More particularly, the affirmative acts are: (1) unconscionable commercial practices, (2) acts of deception, (3) fraud, (4) false pretenses, (5) false promises, or (6) affirmative misrepresentations. *Viking Yacht Co., Inc. v. Composite One LLC*, 385 Fed.App'x. 195, 200 (3d Cir. 2010) (citing § 56:8-2). The knowing omission language refers to the "knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission . . . ." § 56:8-2; s*ee Stoecker*, 975 A.2d 975. Here, the allegations are that Satkin engaged in unconscionable commercial practices as well as a knowingly omitted a material fact.

### a. *Unconscionable Commercial Practice*

The Plaintiffs allege that Satkin "engaged in unconscionable commercial practices, deception, fraud, false pretense, false promise and/or misrepresentations relating to the August 4, 2006 mortgage loan transaction, detailed in the foregoing allegations of fact." Compl. ¶ 103. Those "foregoing allegations" allege that: 1) the loan was made without regard to the Plaintiffs' ability to repay and that the loan was unaffordable from the beginning (*Id.* at ¶ 31); 2) the initial "teaser" payment of $1,490.15 exceeded their monthly income (*Id.* at ¶ 83); 3) despite the Plaintiffs' stated desire to lower their monthly payments on account of their unsecured debts, the loan did not provide them with any net benefit and placed them at risk of losing their home (*Id.* at ¶ 38); and 4) the mortgage broker fee of $8,400 and the yield spread premium of $8,925 were grossly unfair and unconscionable as they amounted to 4.125% of the principal amount of the loan (*Id.* at ¶ 41).

In their answers to interrogatories the Plaintiffs related that they sought advice from Satkin because they were having difficulty paying their credit card debt. The HUD loan closing statement demonstrates that the mortgage balances on their home increased by $70,000 as a result of the refinancing (from $350,000 to $420,000), yet they were merely concerned with $37,000 in credit card debt. Among the costs of financing was $17,325 to Satkin's employer.

"The word 'unconscionable' must be interpreted liberally so as to effectuate the public purpose of the CFA." *Associates Home Equity Services, Inc. v. Troup*, 778 A.2d 529, 543 (N.J. Super. App. Div. 2001). "Unconscionability" has been defined as "an amorphous concept obviously designed to establish a broad business ethic." *Jefferson Loan Co., Inc. v. Session*, 938

A.2d 169, 178 (N.J. Super. App. Div. 2008). "The standard of conduct contemplated by the unconscionability clause is good faith, honesty in fact and observance of fair dealing." *Kugler v. Romain*, 279 A.2d 640, 652 (N.J. 1971). The "capacity to mislead" is the main factor when evaluating a claim under unconscionable commercial practice. *Fenwick v. Kay Am. Jeep*, Inc., 371 A.2d 13 (N.J. 1977).

Predatory lending, if proven, would properly be classified as an unconscionable commercial practice.[1] *See, e.g.*, *Gonzalez v. Wilshire Credit Corp.*, 25 A.3d 1103, 1118-19 (N.J. 2011).

Predatory lending has been described as:

> a mismatch between the needs and capacity of the borrower.... In essence, the loan does not fit the borrower, either because the borrower's underlying needs for the loan are not being met or the terms of the loan are so disadvantageous to that particular borrower that there is little likelihood that the borrower has the capability to repay the loan.

---

[1] The New Jersey Home Ownership Security Act demonstrates that abusive lending practices are against the public policy of this state. The legislative findings of that statute provide, in part:
> a. Abusive mortgage lending has become an increasing problem in this State, exacerbating the loss of equity in homes and causing an increase in the number of foreclosures in recent years. One of the most common forms of abusive lending is the making of loans that are equity-based, rather than income-based. The financing of points and fees in these loans provides immediate income to the originator and encourages the repeated refinancing of home loans. The lender's ability to sell loans reduces the incentive to ensure that the homeowner can afford the payments of the loan. As long as there is sufficient equity in the home, an abusive lender benefits even if the borrower is unable to make the payments and is forced to refinance. In addition, the financing of high points and fees causes the loss of precious equity in each refinancing and often leads to foreclosure.
>
> b. Abusive lending has threatened the viability of many communities and caused decreases in home ownership. While the marketplace appears to operate effectively for conventional mortgages, too many homeowners find themselves victims of overreaching lenders who provide loans with unnecessarily high costs and terms that are unnecessary to secure repayment of the loan.

N.J. STAT. ANN. § 46:10B-23 (West 2012).

*Troup*, 778 A.2d at 536-37 (quoting Daniel S. Ehrenberg, *If the Loan Don't Fit, Don't Take It: Applying the Suitability Doctrine to the Mortgage Industry to Eliminate Predatory Lending*, 10 J. Affordable Hous. & Cmty. Dev. L. 117, 119-20 (Winter 2001)).

In *Troup*, the assignee of a note and mortgage foreclosed against the homeowners who then counterclaimed, alleging violations of several statutes including the CFA and the Truth in Lending Act (TILA) by the original lender and the assignee. *Troup*, 778 A.2d at 534. The main allegations were that the lender provided the borrowers with a high interest rate loan despite the borrowers' favorable debt to income ratio and their relatively unblemished credit history. *Id.* at 265. There were also allegations of "reverse-redlining."[2] *Id.* at 268. The New Jersey Superior Court held, *inter alia*, that the issue of whether acts of original lender, assignee, and others were unconscionable was for jury to decide.

Similarly, in *Pezza v. Wells Fargo Bank, N.A.*, the plaintiffs brought an action under TILA and the CFA. Slip Copy, 2011 WL 3847248, *1 (D.N.J. 2011). The plaintiffs argued that the CFA was violated by the lender offering them a higher interest rate than the one they qualified for, by increasing their interest rate despite their payment of discount points, and by providing the plaintiffs with an unaffordable loan. *Id.* at *6. In that case, despite deposition testimony by the plaintiffs that the loan was affordable, the court still found that the loan may not have "fit the borrower" and that affordability was a matter for trial. *Id.* at *9-*10.

In the case at bar, the Plaintiffs argue that the loan was unaffordable. In answers to interrogatories the Plaintiffs state:

---

[2] "Reverse-redlining" is the practice of providing credit on unfair terms to a particular community based on the income, race, or ethnicity of that community's residents. *Troup*, 778 A.2d at 537.

> 8. The result of the refinancing was to secure previously unsecured obligations, refinance a low cost mortgage with a higher cost alternative, creating a monthly obligation that was unrealistic based on our combined monthly income. The credit card debt refinanced was secured against our home, creating an increased risk that we would lose it.
>
> 9. My wife and I completed interviews with Mr. Satkin disclosing our actual monthly income. It was too low to realistically meet the new monthly mortgage obligation. The application disclosed our assets and liabilities. Information about our income is not on the application.

Pls.' Answers to Interrog. of Def. Satkin ¶¶ 8-9.

The Plaintiffs certify that their monthly combined income totaled $1,834.66 in 2006. Additionally, the Plaintiffs argue that they did not need to refinance their first mortgage, but only their second and that Satkin's choice of refinancing their first mortgage resulted in larger mortgage broker fees and yield spread premium than was necessary. Whether the $17,325 in broker fees and yield spread premium fees were appropriate is clearly an issue that requires looking at the transaction as a whole and requires understanding Satkin's reasoning behind selling the Plaintiffs this particular product.

In response, Satkin certifies:

> 7. Prior to closing this mortgage loan, the Plaintiffs and I met in person at their home to discuss the terms of the loan, so they could see the loan application form, and answer any questions they might have had. Together we reviewed the loan application and Plaintiffs decided that this would meet their goal of what they were trying to obtain through this refinance transaction.
>
> . . .
>
> 10. Contrary to Plaintiffs' Answer to Interrogatory No. 22 (Exhibit "2"), Plaintiffs did not qualify for a reverse mortgage at the time of

10

>   their transaction.

Def.'s Certification in Supp. of Mot. for Summ. J. ¶¶ 7, 10

>   In opposition to the motion for summary judgment, Plaintiffs certify:
>
>>   Mr. Satkin met with me to discuss my reasons for seeking another refinancing, and put together the mortgage application.  Mr. Satkin obtained information about the credit card debt which was a burden to my wife and me, and about our income which was limited to social security and earnings from part time work as a limo driver, and a small business operated by my wife.
>>
>>   Mr. Satkin held himself out as knowledgeable about financing alternatives.   I relied on Mr. Satkin's advice and assistance.
>>
>>   Mr. Satkin interviewed me about the reasons for the refinancing and my financial problems.   He obtained financial information which made it clear the mortgage repayment alone would consume nearly all the combined income of my wife and me.
>>
>>   Mr. Satkin did not offer the option of a second mortgage, which would not have refinanced the entire balance of the fixed rate first mortgage and would not have exposed me to an adjustable rate on the entire mortgage amount.

Certification of Def. John Keith Bagot in Opp'n to Defs. Joshua Satkin, GMAC, Anad [sic] Wells Fargo's Mot. for Summ. J. ¶¶ 4-7.

   Essentially, Satkin's argument, as to the unconscionable commercial practices allegations, is that he and the Plaintiffs reviewed this loan to ensure that it met their needs.   The factual question that remains here is whether this loan was affordable from the beginning.   Additionally, there is a question as to whether this loan was predatory, which would lead to the conclusion that Satkin engaged in an unconscionable commercial practice in violation of the CFA.   The loan does not appear to have fit the Plaintiffs' needs in that the Plaintiffs' income could not possibly cover

the payments. Additionally, the loan was clearly made without regard to the Plaintiffs' income as Satkin concedes. This loan product evidently did not require income verification and none was sought. Because of this, and that the loan converted unsecured debt to secured debt, the loan put the Plaintiffs at an unreasonable risk of losing their home. This would mean that "the terms of the loan [were] so disadvantageous to [these] particular borrower[s] that there [was] little likelihood that the borrower[s] ha[d] the capability to repay the loan." *Troup*, 778 A.2d at 536-37. Satkin's argument that he had no control over the transaction and was merely an employee of the mortgage broker may be relevant to whether Satkin violated the CFA himself. However, the record currently does not resolve this factual question.

Based on the existence of factual disputes, the court will not grant summary judgment as to the allegation of a violation of the consumer fraud act by an unconscionable commercial practice.

### b. *Knowing Omission of a Material Fact*

The knowing omission of a material fact with intent that others rely upon the omission may lead to liability under the CFA. § 56:8-2. The Plaintiffs' complaint alleges:

> 103. Defendants GMAC, BankUnited, GCF Products, GC Acceptance, Wells Fargo, Howard Olmstead and Joshua Satkin engaged in acts of omission, including but not limited to knowing concealment, suppression and omissions of material facts in connection with the August 4, 20006 mortgage loan transaction detailed in the foregoing allegations of fact.
>
> 106. Joshua Satkin did not disclose the terms of the loan to the Bagots.

Compl. ¶¶ 103, 106.

Their certification explains:

> 8. In connection with this lawsuit, I successfully obtained a bank commitment for a reverse mortgage of $405,000 in last year's real estate market.   At the time I entered into the financing which is the subject of this lawsuit, I was about 75 years old, and my wife 74. The property that secures the mortgage that is the subject of this lawsuit, was valued at about $600,000, well below today's valuation.   I have every reason to believe a reverse mortgage would have been available to me at the time I entered into the last refinancing.
>
> 10. Mr. Satkin did not inform me that he or his firm would be paid a Yield Spread Premium of $8,925, more than the $8,400 mortgage broker fee I paid him.

Certification of (Plaintiff) John Keith Bagot in Opp'n to Defs. Joshua Satkin, GMAC, Anad [sic] Wells Fargo's Mot. for Summ. J. ¶¶ 8, 10.

In this case, there are several factual questions remaining that the record does not answer. Although Satkin argues that the Plaintiffs did not qualify for a reverse mortgage, Mr. Bagot certifies that he subsequently received a commitment for a reverse mortgage.   If the Plaintiffs did qualify for a reverse mortgage and this fact were not disclosed to them, the court could reasonably find that it was a material fact.   Such a disputed fact may only be resolved at trial and Mr. Bagot's testimony that he was subsequently approved for a reverse mortgage could support a finding that it was an option that Satkin should have offered them.   Additionally, whether Mr. Satkin intended for the Plaintiffs to rely on this omission is a factual question better reserved for testimony and cross examination at trial.   As such, summary judgment on this issue is also inappropriate.

*Common Law Fraud*

In order to establish a cause of action for fraud, the Plaintiffs must show that: (1) a material misrepresentation of fact; (2) knowledge of its falsity; (3) an intention that the other person rely on

it; (4) reasonable reliance thereon; and (5) resulting damages. *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997). A failure to disclose a material fact may constitute fraud where there is a duty to disclose, such as where one party reposes trust and confidence in the other. *United Jersey Bank v. Kensey*, 704 A.2d 38, 44 (N.J.Super. App. Div. 1997). In this case, the Plaintiffs allege that they trusted Satkin to advise them regarding their credit problems. He, being a licensed mortgage solicitor, held himself out to provide such service for a fee. Under these circumstances, Satkin had a duty to disclose all material information regarding Mr. and Ms. Bagots' options to deal with their debts.

The Plaintiffs argue that Satkin represented that refinancing both of their mortgages was the best way for them to solve their credit problems, when in fact there were other, more favorable options available to them. For example, they might have sought an increase in their home equity line of credit to deal with their credit cards, and did not need to refinance their first mortgage that was of recent vintage and had favorable terms. Also, they allege that they could have applied for a reverse mortgage that would not have required any payments from them so long as they resided in their home. The Plaintiffs maintain that Satkin steered them towards the more expensive and inappropriate mortgage product to generate larger fees for his employer.

Satkin's primary defense is that the statements and actions were those of third parties over whom he had no control, i.e. the other defendants in the action. Satkin points out that he did not prepare or execute any of the closing documents in the transaction. Further, Satkin argues that the Plaintiffs are attempting to place the liability of the employer onto the employee.

In terms of factual disputes, the Plaintiffs and Satkin disagree over whether the Plaintiffs

14

would have qualified for a reverse mortgage.   The Plaintiffs argue that they would have qualified while Satkin argues that they would not have.   Also, Satkin says the Plaintiffs would need expert testimony to prove they would have qualified for a reverse mortgage and they have not identified an expert.   In response, Mr. Bagot certifies that he subsequently received a commitment for a reverse mortgage that demonstrates his qualifications.   The court finds this is a disputed fact that may only be determined at trial and, while expert testimony might be helpful, Mr. Bagot's testimony that he was subsequently approved for a reverse mortgage could support a finding that it was an option that Satkin should have offered them.

Satkin also argues that he was a mortgage solicitor and not a mortgage broker and, therefore, his professional duty was lower than that of a mortgage broker.   The ongoing dispute that as to whether Satkin is a mortgage solicitor or a mortgage broker is irrelevant to the fraud analysis.   Neither party has pointed to any case law discussing the standard of care demanded of a mortgage solicitor.   Nevertheless, in this case it is clear that the Plaintiffs reposed trust and confidence in Satkin.   He had a duty to disclose all viable financing alternatives and assist his clients in choosing the most appropriate one

Second, Satkin's argument that he did not have any control over his employer and therefore the alleged wrongful acts are the acts of another party, misdirects the analysis.   The proper analysis under New Jersey law is not on who was in control of the action, though it may be relevant.   Rather, the analysis is to be focused on the actions of Satkin, just as in the CFA analysis above.   *See Allen v. V & A Bros., Inc.*, 26 A.3d 430, 442-44 (N.J. 2011).   In the event that two parties are accused of fraud, the fact that one was in control of the situation does not automatically

relieve the other party from liability.  *See id.*

In the end, however, even if these factual disputes were clearly answered in the pleadings, the court would still be unable to resolve this dispute via summary judgment.  As explained, some of the allegations are simply not addressed.  Also, there is no deposition testimony or courtroom testimony pertaining to Satkin's knowledge or intent.  There is a dispute as to whether the Plaintiffs relied on the alleged misrepresentations and omissions in that Satkin argues that the Plaintiffs wanted the precise loan that was issued.  Finally, there is a question over whether the alleged fraudulent behavior was that of Satkin or whether it was that of some other party.[3]

## **CONCLUSION**

There are genuine issues of material fact relating to whether Defendant, Satkin, violated the Consumer Fraud Act by: (1) recommending a loan that the Plaintiffs could not afford; (2) unnecessarily refinancing the first mortgage to generate larger mortgage brokerage fees; or (3) failing to recommend a reverse mortgage as a more appropriate product.  Also, there are genuine issues of material fact relating to the common law fraud count as to whether Satkin breached his duty to disclose that there were other, less expensive, financial options that met Plaintiffs' needs. Satkin's motion for summary judgment is denied.

Dated: March 6, 2012                    /S/ ***Raymond T. Lyons***
                                        United States Bankruptcy Judge

---

[3] Satkin's reference to "Respondeat Inferior" does not illuminate the analysis.  As stated several times, the focus is not on the actions of other parties, rather the focus is on Satkin's actions.  The court does not interpret the Plaintiffs' action as an attempt to impute the liability of the "Superior" onto the "Inferior."

16